UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

PINE BLUFF SAND AND GRAVEL COMPANY                               PLAINTIFF

v.                                                              No. 5:24-cv-174

HDR ENGINEERING, INC.                                           DEFENDANT

* * * * *

## ORDER AND OPINION GRANTING PARTIAL SUMMARY JUDGMENT

As part of a quarry expansion project on the Cumberland River, Pine Bluff Sand and Gravel Company hired HDR Engineering to construct borings that would support Pine Bluff's conveyor. Pine Bluff later discovered that its conveyor was sliding toward the river—because of (it says) inadequate structural support caused (at least in part) by HDR's deficient work. So Pine Bluff sued HDR for more than $1 million in damages.

Normally that amount would easily clear the $75,000 threshold for diversity jurisdiction in federal court. 28 U.S.C. § 1332. But HDR points to a clause in its contract limiting liability to "the lesser of $1,000,000 or its fee," which here was $36,200. Whether Pine Bluff may seek more—or even remain in federal court—turns on whether that liability-limiting provision is enforceable as a matter of Kentucky law. Because it is, the Court grants HDR's motion for partial summary judgment.

## THE RECORD

According to the complaint and the undisputed summary-judgment record, Pine Bluff Sand and Gravel Company is a "corporation specializing in marine construction and material production and sales" operating in Salem, Kentucky. Complaint (DN 1) ¶¶ 6–7. In 2023, Pine Bluff expanded its quarry on the Cumberland River. ¶ 8. As part of that project, HDR Engineering served as the "geotechnical engineer" and was responsible for drilling 11 borings 50 feet deep or until encountering bedrock. ¶¶ 9–10. The purpose of these borings was to provide structural support to a conveyor that would move rock from the quarry onto barges. Response to MSJ (DN 26) at 1–2. Under the parties' contract, Pine Bluff agreed to pay HDR $36,200 for the construction of the borings, lab testing on samples collected during construction, and a "bearing capacity and settlement analysis for each of these structures." Contract and Scope of Services (Ex. 3 & 3A, DN 25-4) at 2, 5.

1

After HDR completed its work, Pine Bluff "discovered a crack along the riverfront near the support foundation of the conveyor that was constructed as part of the project." Response to MSJ at 2. Its investigation determined that the conveyor foundation had shifted, causing the conveyor to slide toward the water. *Id.* Pine Bluff sued HDR for breach of contract, contractual indemnification, and negligence per se, alleging that inadequate structural support for the conveyor was the result of HDR's failure to drill all the way to bedrock at the conveyor site. *Id.*

HDR disputes both negligence and causation. Its position is that Pine Bluff's own overdredging of the riverbank rendered the conveyor foundation unstable. Motion for Summary Judgment (DN 25-1) at 2–3.

But HDR has moved for partial summary judgment on a more limited ground. The contract purports to cap its liability at the lesser of $1,000,000 or its total fee, which (undisputedly) amounted to $36,200. An addendum to the agreement—incorporated by reference in Section II—contained a provision titled "Allocation of Risk," which states:

> Owner and engineer have evaluated the risks and rewards associated with this project, including engineer's fee relative to the risks assumed, and agree to allocate certain of the risks, so, to the fullest extent permitted by law, the total aggregate liability of engineer (and its related corporations, subconsultants and employees) to owner and third parties granted reliance is limited to the lesser of $1,000,000 or its fee, for any and all injuries, damages, claims, losses or expenses (including attorney and expert fees) arising out of engineer's services or this agreement regardless of cause(s) or the theory of liability, including negligence, indemnity, or other recovery.

HDR Engineering Terms and Conditions for Professional Services (Ex. 3B, DN 25-4) ¶ 17.

That "Allocation of Risk provision," HDR insists, is consistent with and enforceable under Kentucky law. Given that it prevents Pine Bluff from recovering more than the $75,000 jurisdictional threshold, HDR says, this lawsuit's amount in controversy cannot support diversity jurisdiction and must be dismissed from federal court. MSJ at 21–23 (citing 28 U.S.C. § 1332(a)).

Pine Bluff, for its part, disagrees that the cap is enforceable but agrees that the motion presents a pure question of law ripe for determination on summary judgment. The phrase "to the fullest extent permitted by law," it maintains, renders this clause a dead letter for two reasons. First, Kentucky law categorically prohibits such indemnity or hold-harmless clauses in construction contracts. Response to MSJ at 6. Second, Kentucky law prohibits parties from contracting away liabilities caused

2

by violating a safety statute, which renders this clause void as a matter of public policy. *Id.* at 11–12.

**LEGAL ANALYSIS**

**A. Statutory Law.** K.R.S. § 371.180(2) renders "void and wholly unenforceable" "[a]ny provision contained in any construction services contract purporting to indemnify or hold harmless a contractor from that contractor's own negligence or from the negligence of his or her agents, or employees." The question here is whether the Allocation of Risk provision in the parties' contract falls within this prohibition.

HDR contends that the Allocation of Risk provision doesn't indemnify (or "hold harmless," or otherwise entirely eliminate) its liability, but instead merely limits its potential exposure. The two types of provisions, according to HDR, differ not only in degree but also in kind—with Kentucky law frowning only on the former.

No published Kentucky decision appears to have addressed whether the statute reaches a clause that merely limits liability—as opposed to one that eliminates it entirely. As explained below, this statute does not reach a provision like HDR's. At least with respect to a liability limitation that would leave the contracting party vulnerable to damages in negligence up to its own fee, the statute doesn't foreclose an agreed allocation of risk between two sophisticated commercial actors.

As to the text, the statute voids only provisions that "indemnify" or "hold harmless" a contractor. Dictionaries define those terms to cover a complete, rather than partial, shield from liability. To indemnify is to "reimburse (another) for a loss suffered because of a third party's or one's own act or default; hold harmless." *Indemnify*, BLACK'S LAW DICTIONARY (11th ed. 2019). And to hold harmless "absolve[s] (another party) from *any* responsibility for damage or other liability arising from the transaction; indemnify." *Hold Harmless*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). Neither party has pointed to any different usage or meaning adopted by Kentucky's General Assembly. The ordinary legal meaning of the statute, therefore, draws the same line as HDR: between provisions capping exposure and those eliminating it.

But the statute says nothing about a provision that merely limits a counterparty's liability. And the Allocation of Risk provision states that HDR's "total aggregate liability … is limited to the lesser of $1,000,000 or its fee." Ex. 3B ¶ 17. The provision thus caps, but does not eliminate, liability. HDR remains exposed to liability for its own negligence up to its fee of $36,200.

As to context, a surrounding provision tracks this same textual distinction. Elsewhere in its "Terms and Conditions," the contract contains a separate provision in which "ENGINEER agrees to indemnify OWNER for third party personal injury

3

and property damage claims to the extent caused by ENGINEER's negligent acts, errors, and omissions." Ex. 3B ¶ 2. This is an indemnity clause—in those terms and in the classic sense of one party promising to cover the other's exposure to a third party's claim. The Allocation of Risk provision, found several paragraphs later, does no such thing. It doesn't use the words "indemnify" or "hold harmless"—even though the drafters plainly knew how to and apparently understood the difference. Nor does the Allocation of Risk provision purport to shunt potential liability to any third party from HDR onto Pine Bluff (or anyone else), leaving HDR insensitive to the civil repercussions of any negligence. To the contrary, HDR expressly *took on* liability that might result from its own fault.

And as to precedent, decisions from other states have consistently distinguished between (oft impermissible) indemnity and (permissible) limited-liability clauses. A Pennsylvania statute that resembles Kentucky's, for example, voids provisions purporting to "indemnify or hold harmless" a design professional. *Valhal Corp. v. Sullivan Associates, Inc.*, 44 F.3d 195, 202 (3d Cir. 1995). Yet the Third Circuit enforced a limitation-of-liability clause capping an architect's exposure at $50,000 or its total fee. Despite the statute, the architect "remain[ed] liable for its own negligence and continue[d] to be exposed to liability up to" a specified amount. *Id.* at 202.

The Arizona Supreme Court reached the same conclusion about a similar state statute. In *1800 Ocotillo, LLC v. WLB Group, Inc.*, the court rejected the argument that Arizona's anti-indemnity statute prohibited a clause capping an engineering firm's liability at the total amount of its fee. 196 P.3d 222, 225 (Ariz. 2008). The opinion distinguished indemnity or hold-harmless provisions; those are objectionable because they "eliminat[e] all liability for damages," which in turn "eliminates much of the incentive to exercise due care." *Id.* A liability cap does not pose that risk, however, at least so long as it leaves the responsible party exposed to a loss substantial enough to preserve its incentive to perform. And a cap pegged to the engineering firm's fee did so, preserving "a substantial interest in exercising due care because [the firm] stands to lose the very thing that induced it to enter into the contract." *Id.* Only "a dollar amount so low as to effectively eliminate the incentive to take precautions" might raise the same concerns as an impermissible indemnity clause. *Id.*

Other courts have made the same point. A cap that preserves some substantial liability relative to the consideration received is distinguishable from an outright indemnity or hold-harmless provision. *See, e.g.*, *US Nitrogen, LLC v. Weatherly, Inc.*, 343 F. Supp. 3d 1354, 1359–60 (N.D. Ga. 2018) (enforcing a clause capping an engineer's liability at 15% of the contract price despite Georgia's anti-indemnity statute); *Ralph Korte Construction Co. v. Springfield Mechanical Co.*, 369 N.E.2d 561, 562–63 (Ill. App. 1977) (similar, under Illinois state law).

HDR makes an additional plausible—if aggressive—textual suggestion. If accepted, this construction would entirely exclude it and similar construction companies from the reach of § 371.180. The statute defines a "contractor" as "the person offering a contract for services provided" and a "contractee" as the person providing services under a contract. K.R.S. §§ 371.180(1)(b) & (c). Under those definitions, HDR appears to be the "contractee" providing services, not the "contractor" obtaining "services provided" by another. And the statute bars only contracts "purporting to indemnify or hold harmless *a contractor* from that contractor's own negligence or from the negligence of his or her agents, or employees." K.R.S. § 371.180(2) (emphasis added). Admittedly, that reading sits uncomfortably with our ordinary, colloquial understanding of a "contractor" as the party performing work at another's behest. *See Contractor*, Black's Law Dictionary (11th ed. 2019). And such an interpretation would serve a different and narrower (albeit not irrational) policy goal of ensuring construction companies didn't shunt liability onto *sub*contractors ("contractees").

Despite the plausibility and even persuasiveness of this reading of the plain text, HDR points to no other courts that have adopted its stingier construction. And this decision needn't be the first. Because it's unnecessary to reach the conclusion HDR urges: even assuming "contractor" covers any party providing construction services, § 371.180's "indemnity or hold harmless" prohibition doesn't reach *limitations* on liability like this one.

Pine Bluff offers several reasons to read the statute's prohibition more broadly. None is persuasive.

*First*, Pine Bluff points to a recent decision of the Kentucky Court of Appeals regarding this statute. In *Main Street Revitalization, LLC v. Cincinnati Insurance Co.*, the court read the statute to trump a waiver-of-subrogation clause that purported to reallocate risk from developer to insurer. 731 S.W.3d 860 (Ky. Ct. App. 2025). And it did so even though that clause didn't speak in terms of "indemnification" or "hold[ing] harmless." Tracking the same distinction drawn above regarding the presence or absence of meaningful incentives, however, the panel observed that the clause let the negligent contractor entirely "escape any consequences of [its] alleged negligence," given the amount of available insurance proceeds. *Id.* at 866. So the court rejected the liability provision. But as noted, this contract falls on the other side of the line: its risk provision merely caps—rather than eliminates—a party's liability.

*Second*, Pine Bluff argues that the capped exposure is too small. Measuring HDR's potential risk relative to Pine Bluff's claimed damage—$36,000 versus an alleged loss of roughly $1.4 million—Pine Bluff casts this as the practical equivalent of a release. In support it points to *Mullins v. Northern Kentucky Inspections, Inc.*,

which held that a $200 cap—against $7,400 in damages—was "tantamount to an exculpation clause." No. 2009–CA–67, 2010 WL 3447630, at *1 (Ky. Ct. App. Sept. 3, 2010). This, the panel noted, left the home inspector with "nothing more than a refund of the fee charged." *Id.* at *1. But *Mullins* never mentioned—much less construed—K.R.S. § 371.180(2). Instead, the court rested entirely on common-law public-policy grounds specific to that case: namely, a pre-printed, take-it-or-leave-it adhesion contract between a licensed professional and an unsophisticated homebuyer.

Regardless, the reasoning of the leading case applying a statute like the one here takes a different approach to measuring meaningful exposure than did the *Mullins* court. The Arizona Supreme Court assessed the magnitude (and therefore enforceability) of a cap relative to the parties' consideration, not to a plaintiff's asserted damages. *See, 1800 Ocotillo*, 196 P.3d at 225–26. This approach recognizes the salience of a defendant's incentive, not the plaintiff's demand—which doesn't find purchase in either the statutory text or courts' related public-policy concerns. Pine Bluff's alternative approach would introduce great uncertainty: *every* limitation-of-liability clause would be vulnerable based on the contingency of a damages demand that lies (at least at the pleadings stage) entirely within the control of the plaintiff. In terms of the contracting parties' planning and primary conduct, who could anticipate how a bargained-for limit might compare against some hypothetical future damages—and therefore whether the limit would prove enforceable?[1]

Under this approach, the relationship between HDR's consideration and potential exposure is entirely reasonable. Its fee was apparently its only consideration for performing this engagement. And the Allocation of Risk provision leaves the entirety of that fee at risk. Whether absent such a bargained-for limit Pine Bluff might seek $362,000 or $1 million or more is immaterial to the question whether the limitation-of-liability clause "eliminates all liability for damages" and thereby "eliminates much of the incentive to exercise due care." *Id.* at 225.

Nothing in K.R.S. § 371.180(2), therefore, prohibits the Allocation of Risk clause in the parties' contract here.

---

[1] The Alaska Supreme Court read the word "indemnify" broadly to mean "exempt" from liability, and on that basis held that a fee-sized cap fell within the statute's prohibition. *City of Dillingham v. CH2M Hill Northwest, Inc.*, 873 P.2d 1271, 1276–78 (Alaska 1994). But the Alaska court's holding turned heavily on state-specific legislative history showing that the Alaska legislature had considered and rejected a proposed exemption for limitation-of-liability clauses. Even to the limited extent it might be relevant, no parallel history exists here. *See 1800 Ocotillo*, 196 P.3d at 226 (declining to follow *Dillingham* for this reason).

**B. Public Policy.** Pine Bluff also argues that the contract is void because it is contrary to public policy. Under Kentucky law, courts may void contracts on public-policy grounds when the contract contravenes a "clear and certain statement of strong public policy in controlling laws or judicial precedent." *State Farm v. Hodgkiss-Warrick*, 413 S.W.3d 875, 880 (Ky. 2013). Here, Pine Bluff points to safety provisions codified in the Kentucky Building Code, which HDR allegedly violated by not employing a qualified supervisor on site during drilling. Response to MSJ at 12–13.[2] For its part, HDR denies that the safety statute covers its role in the project—or that it violated the code in any event.

The Court need not resolve those factual and regulatory questions for a more fundamental reason: sophisticated parties may contractually allocate risk among themselves under Kentucky law. The Kentucky Supreme Court has made this principle clear, even when the risk results from safety-statute violations. In denying a similar attempt to negate a risk-allocation provision in *Cumberland Valley Contractors v. Bell County Coal Corp.*, the court explained that "sophisticated corporate entities" permissibly "negotiated the allocation of a jointly shared risk and expressly incorporated that risk allocation into a contract that neither of them was compelled to enter into." 238 S.W.3d 644, 652–53 (Ky. 2007). The same principle dictates the same outcome here.

Pine Bluff, to be sure, points to an earlier opinion suggesting that parties may not contractually waive tort liability for the consequences of codebreaking. *See Hargis v. Baize*, 168 S.W. 36, 47 (Ky. 2005). But that decision, especially when read in the light cast on it by *Cumberland Valley*, looks to an imbalance in the sophistication or leverage of the parties—not the mere existence of an alleged safety statute violation. *Hargis* had stated that "a party cannot contract away liability for damages caused by that party's failure to comply with a duty imposed by a safety statute." *Id.* But the Kentucky Supreme Court subsequently clarified that seemingly categorical language: a "significant disparity in bargaining power" had driven the result in *Hargis*. *Cumberland Valley*, 238 S.W.3d at 651; *see also id.* at 650 ("[M]ore

---

[2] The safety statute that Pine Bluff cites is K.R.S. § 198B.130, which creates a private right of action for violations of the Uniform State Building Code. The building code is the product of administrative regulation codified at 815 K.A.R. 7:120. That regulation, in turn, incorporates by reference the 2015 International Building Code, chapter 18 of which addresses "Soils and Foundations." *See* Ex. 5 (DN 26-5). Section 1803.4 of that chapter provides that a "registered design professional"—here, presumably, HDR—"shall have a fully qualified representative on site during all boring or sampling operations." *Id.* Pine Bluff alleges that HDR subcontracted the drilling to Holcomb Engineering and did not have one of its own representatives on site when a Holcomb technician failed to drill as deeply as the contract provided. Response to MSJ at 2.

recent cases, even those invalidating exculpatory clauses on the basis of public policy, can be harmonized with [*Greenwich Ins. v. L&N Railroad*, 66 S.W. 411 (1902)] by focusing on the parties' bargaining power."). Absent some indication that the parties in *Cumberland Valley* "were not on a footing of equality" or that the contract was not the product of "arm's length" negotiation, Kentucky's highest court declined to invalidate a contractual provision allocating risk—regardless of whether that risk was traceable to noncompliance with a safety statute. *Id.* at 653–54.

A federal district court decision recently and aptly summarized Kentucky law on this point: despite the protections of the "public policy" doctrine, "a party can limit its liability for safety violations if: (1) it specifically negotiates to limit or shift liability; (2) the parties are in equal bargaining position; and (3) neither were compelled to obtain a necessity." *Frankenmuth Insurance Co. v. Koorsen Fire & Security*, No. 5:23-cv-333, 2025 WL 1919813, at *5 (E.D. Ky. July 11, 2025) (citing *Martin County Coal Corp. v. Universal Underwriters Insurance Co.*, 727 F.3d 589, 596 (6th Cir. 2013)). All three of those features were present, for example, in *Davis H. Elliot Construction Co. v. High Voltage Maintenance Corp.*, No. 5:21-cv-235, 2025 WL 958157 (E.D. Ky. Mar. 31, 2025). There, the district court emphasized the parties' equal footing in negotiating an arm's-length exculpatory clause, which the court enforced "despite presence of a statutory safety or public purpose" covered by the provision. *Id.* at *2–3.

Pine Bluff doesn't contend that HDR had it over a barrel or otherwise wielded unequal bargaining power when Pine Bluff hired HDR for engineering work. Its summary-judgment response (at 11) took no issue with HDR's description of the parties' equivalent positions in the marketplace: "HDR and Pine Bluff are both sophisticated parties because they are corporate entities that have specialized knowledge in their respective fields. HDR has knowledge and experience in architecture, engineering, environmental, and construction services. Pine Bluff has experience and knowledge in marine construction and material production and sales." MSJ at 9 (internal citations and quotation marks omitted).

Instead, Pine Bluff argues that equal bargaining power is irrelevant. What really mattered to the Kentucky Supreme Court in *Cumberland Valley*, it insists, was that the two contracting parties *shared* the relevant duty in the safety statute. *See Cumberland Valley*, 238 S.W.3d at 652. Here, by contrast, HDR alone bore the relevant duty to supervise its drilling. Regardless of whether that accurately describes the facts of *Cumberland Valley*, a shared duty isn't a feature in the other precedent that the Kentucky Supreme Court (and HDR) rely on. Every other decision that Pine Bluff cites—and that this Court has encountered—features unequal bargaining power between the contracting parties.

8

That was the dispositive feature of the contract invalidated in *Martin County Coal*, the only post-*Cumberland Valley* decision cited by Pine Bluff declining to enforce an exculpatory clause. The Sixth Circuit emphasized that the "indemnification agreement was bargained by parties in clearly unequal positions." 727 F.3d at 589. As a result, the mining company couldn't "effectively contrac[t] away liability for damages caused by [its] failure to comply with a duty imposed by a federal mine-safety regulation." *Id.* at 597. This result, the Court of Appeals recognized, was consistent with Kentucky law generally permitting such clauses when negotiated at arm's length: "[I]ndemnification provisions 'applied to defend against the indemnitee's own negligenc[e] are not against public policy generally, but they are when agreed to by a party in a clearly inferior bargaining position.'" *Id.* at 596 (quoting *Speedway Superamerica, LLC v. Erwin*, 250 S.W.3d 339, 344 (Ky. Ct. App. 2008)).[3] Applying that rule here leads to the enforcement, not the nullification, of the Allocation of Risk provision.

**C. Jurisdiction.** HDR is therefore correct that the contract limits its liability to $36,200—plainly less than the minimum amount in controversy for diversity jurisdiction. *See* MSJ at 5. But it doesn't obviously follow that this Court lacks jurisdiction. Does a merits ruling adopting a defendant's position about state contract law mean the plaintiff sued in the wrong court—even though the face of the complaint demanded far more than the threshold amount in controversy?

Normally, the plaintiff is the master of the complaint, whose good-faith demand controls the amount-in-controversy determination. "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted). Good faith is of course not a terribly high bar—and typically would turn on the plaintiff's allegations rather than the defendant's defenses. 5B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (4th ed. 2026) ("Satisfying this … requirement is a relatively simple task….").

---

[3] HDR also addresses whether the contract is unenforceable because it is unconscionable—an argument that Pine Bluff does not appear to have separately raised. To the extent that argument is implicit in Pine Bluff's public-policy argument, however, it fails for similar reasons. Kentucky courts have held that limitation-of-liability clauses are not unconscionable—at least when they are clearly written, properly incorporated by reference, not unduly lengthy, and signed by a sophisticated party. *USAA v. ADT Security Services*, 241 S.W.3d 335, 340 (Ky. Ct. App. 2006). And this provision, as discussed above, was plainly labeled, is only 104 words, and is part of a contract between sophisticated parties.

Ordinarily, the assessment comes at the pleading stage—and is always based on the facts as they existed at the time of the complaint. *See Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 570 (2004). This is consistent with the resistance to "jurisdiction creep" seen in recent decades.[4] And it likewise has the salutary effect of favoring simpler and less litigious non-merits determinations regarding where parties should begin to litigate. *See, e.g.*, *Akno 1010 Market Street St. Louis Missouri LLC v. Pourtaghi*, 43 F.4th 624, 627 (6th Cir. 2022) ("[L]itigants and district courts must assure themselves of subject-matter jurisdiction at the earliest possible moment to avoid wasting judicial and party resources.").

Yet an exception exists if it "appear[s] to a legal certainty that" the amount actually in controversy is "less than the jurisdictional amount." *St. Paul Mercury*, 303 U.S. at 289. As Judge Easterbrook once wondered, "Does this mean 'certain' knowing only what the plaintiff chooses to reveal in the complaint? Or does it mean 'certain' after the judge has invested the energy needed to learn about the facts and the law?" *Pratt Central Park Limited Partnership v. Dames & Moore*, 60 F.3d 350, 352 (7th Cir. 1995). He concluded—as have the majority of circuits, *see* Response to MSJ at 14—that when the import of a contract is "clear," the district judge "possesses the power to eject a case when a contract holds damages below the jurisdictional amount." *Id.* at 353 (noting the tension between the complaint-focused approach of *Bell v. Hood*, 327 U.S. 678 (1946) (merits failure doesn't divest jurisdiction), on the one hand, and the more jurisdictionally jealous approach of numerous circuit-court decisions purporting to apply *St. Paul*'s "legal certainty" exception, on the other).

The Sixth Circuit is among the courts that agree: it treats "proof to a legal certainty that a plaintiff is not entitled" to more than the statutory threshold as a jurisdictional defect. *Sellers v. O'Connell*, 701 F.2d 575, 579 (6th Cir. 1983). This holds true notwithstanding "even a good faith allegation that the [minimum] jurisdictional amount is in controversy." *Id.* In *Sellers*, the plaintiff demanded damages of $9,875—just below the $10,000 then required for diversity jurisdiction—but sought to clear the bar through a $100,000 claim for punitive damages. *Id.* at 579. Notwithstanding this request for far more than the jurisdictional minimum, the Sixth Circuit held the amount in controversy insufficient "to a legal certainty." *Id.* ("The determination of the amount in controversy is fairly uncomplicated when the plaintiff seeks liquidated damages, the amount in controversy being the total of the

---

[4] *Cf. Barrios Garcia v. United States Dep't of Homeland Sec.*, 25 F.4th 430, 439 (6th Cir. 2022) (noting the frequent and casual manner in which courts refer to various challenges as jurisdictional); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) (Ginsburg, J.) (regretting that "jurisdiction" had become a word of "many, too many, meanings") (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (Scalia, J.) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n. 2 (D.C. Cir. 1996) (Randolph, J.))).

liquidated damages.") (quoting *Wood v. Stark Tri-County Building Trades Council,* 473 F.2d 272, 273 (6th Cir. 1973)).  The plaintiff could cite "no case in which [the relevant state] courts have granted punitive damages … on facts similar to those in the present case," so the Court of Appeals affirmed the district court's dismissal for lack of subject-matter jurisdiction.  *Id.*

Other Sixth Circuit decisions have likewise examined the "legal certainty" of a jurisdictional defect by considering whether state law clearly prohibits the damages a plaintiff's complaint seeks.  *See, e.g.*, *Wood*, 473 F.2d at 274; *Kovacs v. Chesley*, 406 F.3d 393, 397–99 (6th Cir. 2005).  Pine Bluff offers no argument why a contract's limitation-of-liability clause would be treated any differently.  A preponderance of courts appears to "have held that where an enforceable contract contains a limitation on liability below the diversity jurisdiction threshold amount, federal courts lack subject-matter jurisdiction over the controversy."  *ChiRhoClin, Inc. v. Grand River Aseptic Manufacturing, Inc.*, No. 1:17-cv-993, 2019 WL 13100196, at *3 (W.D. Mich. June 20, 2019).  Indeed, decisions from other jurisdictions have held as much on reasoning indistinguishable from that of the Sixth Circuit decisions cited above.  *See, e.g.*, *Pratt Central*, 60 F.3d at 353 (enforcing $5,000 limitation-of-liability clause and dismissing for lack of jurisdiction).

Some judges have disagreed.  They've emphasized the irrelevance of affirmative defenses to threshold jurisdictional determinations, the inefficiency of mid-case remands or dismissals, and the incongruity of deciding merits questions of contract and statutory law under the guise of declining jurisdiction.  *See, e.g.*, *id.* at 355–60 (Flaum, J., dissenting) (contrasting majority's rule with *L&N Railway v. Mottley*, 211 U.S. 149 (1908) (defense cannot defeat jurisdiction) and *Mt. Healthy v. Doyle*, 429 U.S. 274 (1977) ("failure to recover jurisdictional minimum does not itself deprive a court of jurisdiction")); *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982) (Winter, J.) ("Even if the Court's interpretation of Florida law were correct, dismissal contravenes the rule that the existence of a valid defense does not deprive a federal court of jurisdiction.").  And even some applications of the majority rule admit of discretion on the part of trial judges when the liability limitation becomes clear only later in litigation, potentially after factual development at summary judgment.  *See, e.g.*, *Pratt Central*, 60 F.3d at 353 ("[I]f it becomes clear some time into the litigation that [a] restriction has teeth, should the judge limit damages via partial summary judgment or dismiss the suit for want of jurisdiction?  Here certainty fails, and the judge must exercise the informed discretion for which the masters of the craft are so valued.").

Given that HDR raised the limitation-of-liability defense promptly in the first substantive motion filed in this case, the undisputed nature of the few facts necessary to resolve this largely legal question on summary judgment, and the apparently modest progress of the litigation before this motion's filing, the most straightforward

11

approach would appear to be dismissal without prejudice for lack of jurisdiction.  That would presumably leave Pine Bluff free to seek relief in a state court of general jurisdiction.  *See, e.g.*, *Taylor v. Owens*, 990 F.3d 493, 496 (6th Cir. 2021) (Dismissal for lack of subject matter-jurisdiction is "without prejudice and leaves the parties free to seek relief in another forum (subject to any rules of preclusion).").  To the extent such an order would present undue complications of timing, venue, or prejudice not apparent from the current record, Pine Bluff remains equally free to move for reconsideration on that basis.  Otherwise the Court anticipates entering a final order of dismissal in approximately 30 days.

## ORDER

The Court grants HDR's motion for partial summary judgment (DN 25).

12